IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TINA L. L.[1]                         )
                                       )
                    Plaintiff,         )
                                       )
vs.                                    )        Case No. 18-cv-0481-CJP[2]
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )
                                       )
                    Defendant.         )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Tina L. L. (Plaintiff) seeks

judicial review of the final agency decision denying her application for Supplemental

Security Income ("SSI") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for SSI on June 12, 2014, alleging a disability onset date of

May 18, 2012. (Tr. 152). Plaintiff's application was denied at the initial level, and

again upon reconsideration. (Tr. 71, 83). She requested an evidentiary hearing,

which Administrative Law Judge ("ALJ") Nathaniel Plucker conducted on April 12,

2017. (Tr. 34-61). ALJ Plucker reached an unfavorable decision on May 30, 2017.

(Tr. 18-29). The Appeals Council denied Plaintiff's request for review, rendering

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 16.

the ALJ's decision the final agency decision.  (Tr. 1-3).  Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court.  (Doc. 1).

## Applicable Legal Standards

To qualify for SSI or disability insurance benefits, a claimant must be disabled within the meaning of the applicable statutes.[3]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

The first step considers whether the applicant is engaging in substantial gainful activity.  The second step evaluates whether an

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245

F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . .. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential,

it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Plucker determined Plaintiff had not engaged in substantial gainful activity since June 5, 2014, the application date. She had severe impairments of mild shoulder degenerative joint disease, carpal tunnel syndrome, coronary artery disease, and patellar chondromalacia. (Tr. 20). None of Plaintiff's impairments, or combinations of impairments, met or equaled a listing. (Tr. 22). ALJ Plucker opined Plaintiff had the RFC to perform sedentary work, with several other restrictions. (Tr. 23). Plaintiff was unable to perform any past relevant work, but could perform other jobs that existed in significant numbers in the national economy. (Tr. 26). Accordingly, ALJ Plucker found Plaintiff not disabled. (Tr. 27).

## The Evidentiary Record

The following summary is directed at Plaintiff's arguments.

### 1. Agency Forms

In her agency forms, Plaintiff alleged that a back injury, anxiety, depression, her leg, and carpal tunnel syndrome limited her ability to work. (Tr. 181). She stated she experienced pain in her back that radiated down her left leg and sometimes to her right leg. The pain prevented her from standing for more than 10 to 15 minutes. Plaintiff's left hand and wrist made it difficult for her to complete "prep work" and carry trays. She could not walk for more than 25 to 30 minutes. (Tr. 202). She could not bend, climb stairs, or lift more than 10 pounds without

pain. Plaintiff could not reach forward, reach overhead, or sit for longer than 10 minutes without readjusting. She could kneel with assistance. Using her hands caused pain and numbness. (Tr. 207-08). On an average day, Plaintiff woke up, ate cereal, and tried to perform light housework, if her conditions permitted her to do so. If not, she laid back down then woke up to feed her dog and shower. She laid down again and watched television until dinner. At night, Plaintiff woke up about every hour due to pain. (Tr. 203).

Plaintiff could prepare sandwiches and microwave dinners and perform light housework. Her pain in her back, hips, legs, shoulders, and left wrist and hand made it difficult for her to perform most house and yard work. She went grocery shopping about two to three times a month. Her hobbies included reading and watching television. She spent time with her mother once a week. (Tr. 204-06).

Plaintiff's conditions had progressively worsened, which caused her depression to worsen as well. She experienced days where she could not get out of bed and felt like crying because of how her pain affected her life. (Tr. 210).

### 2. *Medical Records*

On June 22, 2010, Plaintiff received an injection in her left wrist to treat her carpal tunnel. (Tr. 461).

On July 20, 2010, Plaintiff received an injection of mixed local anesthetic and steroids in her left wrist to treat her carpal tunnel. Dr. Harvey Mirly, the treating physician, noted that Plaintiff had positive carpal tunnel provocative testing including Phalen's and carpal compression. He also noted some deformity in her wrist due to a remote distal

radius fracture.  In a postcard follow-up form, Plaintiff noted some improvement after the injection, but that she still had some sharp pains and numbness at night.  (Tr. 459-60).

Plaintiff returned to Dr. Mirly on January 10, 2013, with recurrent left carpal tunnel.  She was developing symptoms on the right as well.  Dr. Mirly recalled that Plaintiff tried splints and three injections, but was experiencing increasingly severe symptoms.  Dr. Mirly assessed Plaintiff with symptomatic left carpal tunnel.  He opined that it was time for surgery and Plaintiff expressed she would like to proceed.  (Tr. 480).

On January 16, 2013, Plaintiff received authorization for carpal tunnel surgery.  (Tr. 468).

On January 24, 2013, Plaintiff followed up with Dr. Mirly regarding her left open carpal tunnel release.  An inspection revealed incisions that were healing nicely.  There was a little bruising in the palm and distal forearm.  She reported good improvement in her preoperative symptoms and was pleased.  Dr. Mirly encouraged Plaintiff to wear a palmar splint for protection and to gradually increase activity to tolerance.  Dr. Mirly noted that Plaintiff did have some symptoms on the contralateral side, for which he supplied her a right hand splint.  He told her that if it progressed, she could follow-up.  (Tr. 477).

On April 22, 2013, Plaintiff saw Dr. James Wade, her primary care physician, for left shoulder pain.  The record contains notes from Dr. Wade from 2013 and 2014, but they are handwritten and mostly illegible.  Dr. Wade checked the box on his note form corresponding with a change in medication; however, corresponding medication records only indicate that Dr. Wade authorized refills of Plaintiff's Xanax and Tylenol prescriptions. Consent forms indicated that Plaintiff received a right knee joint aspiration and steroidal injection in the same visit.  (Tr. 360-68).

On April 30, 2013, Plaintiff received an MRI of her right knee.  The scan found chondromalacia of the patellar cartilage, evidenced by full thickness chondral fissuring and

subchondral cyst formation near the patellar apex. Dr. Nanveen Saini also noted mild chondral fissuring in the medial and lateral compartments. (Tr. 417).

Plaintiff next visited Dr. Wade on May 6, 2013, for right knee pain and to obtain MRI results. Dr. Wade noted that Plaintiff's left shoulder pain persisted. He assessed Plaintiff with chrondomalacia of the patella and left shoulder pain. (Tr. 358-59).

On January 9, 2014, Plaintiff saw Dr. Wade for left shoulder pain. Dr. Wade ordered X-rays of Plaintiff's knees and shoulder, and referred her to Dr. Lehmann. (Tr. 356-57).

On January 16, 2014, Plaintiff received a 2-view X-ray of her right shoulder for her bilateral shoulder pain. These scans showed possible calcific tendonitis along the greater tubosity, along with mild degenerative change at the acromioclavicular joint. Plaintiff also received a 2-view X-ray of her left shoulder. These scans showed minimal degenerative change at the acromioclavicular joint and mild degenerative spurring along the inferior glenohumeral joint. (Tr. 409, 415).

On the same day, Plaintiff received front and lateral chest radiographs that showed minimal degenerative endplate spurring at the mid-thoracic spine. Plaintiff also received front and lateral X-rays of her right knee that revealed minimal degenerative spurring along the intracondylar spines Additionally, Plaintiff received front and lateral X-rays of her left knee that indicated minimal degenerative spurring along the intracondylar tibial spines. (Tr. 412-14).

On January 21, 2014, Plaintiff saw Dr. Charles Lehmann for bilateral knee pain occurring over the previous six to seven months. Plaintiff described the pain as worse in the right knee than the left knee, and stated that the pain was sharp and aching in quality and moderate to severe in intensity. Dr. Lehmann noted a positive grind test bilaterally; Plaintiff's X-rays of the bilateral knees were unremarkable and her MRI results showed a moderate amount of patellar chrondomalacia. Dr. Lehmann recommended physical

therapy for Plaintiff, and said that he would reassess the Plaintiff's need for Synvisc or cortisone shots on her next visit if she did not see substantial improvement. (Tr. 267-68).

On February 11, 2014, Plaintiff followed up with Dr. Wade for her X-ray results and persistent knee and shoulder pain. Dr. Wade directed Plaintiff to follow up with him in one month. (Tr. 255-56).

On March 13, 2014, Plaintiff followed up with Dr. Wade and reported bilateral left shoulder pain and chronic bilateral knee pain. Plaintiff rated her knee pain at a 4 to 5 out of 10. She rated her hip pain as 8 out of 10 on the pain scale. (Tr. 352-53).

Plaintiff returned to Dr. Lehmann's office on March 18, 2014 and stated that physical therapy worsened her knee pain. Dr. Lehmann noted that he was unsure if Plaintiff's pain was coming from her knees, as she also reported some radiating pains going down her lateral leg. Dr. Lehmann injected Plaintiff's right knee with a mixture of Depo-Medrol and Marcaine. Plaintiff tolerated this procedure well. (Tr. 265-66).

Plaintiff next visited Dr. Wade on April 17, 2014. She reported knee, hip, and shoulder pain. Dr. Wade recommended that Plaintiff follow up with him in one month. (Tr. 351-52).

On May 7, 2014, Plaintiff saw Dr. Lehmann for bilateral knee pain. Plaintiff reported no relief from her symptoms after receiving cortisone shots in both knees on her last visit. She also stated that numbing medication gave her no relief. Sitting and resting in other positions bothered her knees. On physical examination, Dr. Lehmann noted good motor strength and sensation but mild tenderness to palpation over her posterior calf, bilaterally, and her quadriceps anteriorly, bilaterally. Dr. Lehmann assessed Plaintiff with bilateral patellar chrondomalacia. (Tr. 2 63).

Plaintiff followed up with Dr. Wade on May 21, 2014, and reported low back pain, knee pain, and shoulder pain. Dr. Wade ordered an MRI of Plaintiff's left shoulder. (Tr. 349-50).

On June 30, 2014, Plaintiff saw Dr. Wade for back, knee, and shoulder pain. She reported she could not complete the MRI that Dr. Wade ordered after her last visit because of claustrophobia. Dr. Wade recommended that Plaintiff schedule a follow-up visit for two weeks later. (Tr. 347-348).

On July 3, 2014, Plaintiff received a CT scan of her lumbar spine, which returned unremarkable findings. (Tr. 408).

On July 14, 2014, Plaintiff followed up with Dr. Wade and reported spine pain. Dr. Wade noted tenderness at Plaintiff's L-1 vertebrae. (Tr. 345-46).

On July 28, 2014, Plaintiff was admitted to the St. Elizabeth's Hospital Emergency Department with upper chest pains that radiated into her left shoulder and worsened with breathing or movement. Upon physical examination, the attending physician noted tenderness and a limited range of motion in Plaintiff's neck, as well as a tender upper left back and chest wall. An X-ray demonstrated normal heart size and pulmonary vasculature. Her lungs were clear and there was no evidence of pleural effusion or pneumothorax. The physician's primary impression was that Plaintiff has chest wall pain. She was discharged to home that same day. (Tr. 280-95).

On August 12, 2014, Plaintiff returned to Dr. Wade's office and reported persistent lumbar back pain. Dr. Wade prescribed Zoloft and Tylenol and recommended that Plaintiff obtain an MRI. (Tr. 342-43).

On August 18, 2014, Plaintiff received an MRI scan of her lumbar spine. The scan found minimal facet joint degenerative changes and early disc desiccation at the L4-5 vertebrae, and minimal right joint degenerative changes at L5-S1. Dr. Mattingly's

impression of the scan was that Plaintiff had early degenerative disc changes at L4-5, and minimal-to-mild facet joint degenerative changes at L4-5 and L5-S1. (Tr. 419).

On August 18, 2014, Plaintiff received nerve conduction studies of the lower bilateral extremities. Dr. Latha Ravi's interpretation was that these studies were within normal limits. On the same day, Plaintiff received an MRI of her lumbar spine. Plaintiff demonstrated early degenerative disc changes at L4-5, as well as minimal-to-mild L4-5 and right L5-S1 facet joint degenerative changes. (Tr. 405-06).

On August 28, 2014, Plaintiff returned to Dr. Wade's office and complained of persistent lumbar back pain. Dr. Wade again recommended an MRI of Plaintiff's back. (Tr. 340-41).

Plaintiff visited Dr. Mirly on September 16, 2014, and complained of numbness, pain, and tingling in her bilateral hands. Plaintiff reported improvement following her left carpal tunnel release but also stated she had been having symptoms for the previous six months. Plaintiff reported pain at night, particularly if she put her arm over her head. She also had shoulder pain and cervical pain with radiating symptoms distally. Dr. Mirly noted no atrophy. Dr. Mirly opined that her symptoms derived from a cervical source or thoracic outlet syndrome. He advised Plaintiff that he would like to obtain a nerve conduction study and referred her to Dr. Khariton to evaluate for recurrent carpal tunnel versus crevicular radiculopathy. He instructed Plaintiff to follow-up after the evaluation and study. (Tr. 475).

Plaintiff saw Dr. Mirly on October 2, 2014, to follow-up regarding a nerve conduction study. She showed some mild residual left carpal tunnel. Her primary symptoms were in the ulnar nerve distribution. She had no abnormalities in the ulnar nerve. Plaintiff reported pain with overhead activity and at night, particularly if she raised her arm over her head. Dr. Mirly noted Plaintiff's symptoms were atypical for carpal tunnel and could

possibly be thoracic outlet or another neurologic cause. Dr. Mirly advised Plaintiff that he did not believe there was a hand surgical problem present. He wanted to refer Plaintiff to a neurologist but "she [was] on the IPA card and [Dr. Mirly] [was] unable to refer her across the state and unfortunately there [were] no neurologists in town." Dr. Mirly noted that they could also consider an MRI of the neck. (Tr. 473).

On October 9, 2014, Plaintiff received an MRI scan of her left shoulder. Dr. Mattingly opined the scan showed borderline Type III lateral tilted acromion process resulting in some lateral arch narrowing, as well as some mild rotator cuff peritendinitis with primarily tendinotic rotator cuff signal over about a 1.4 centimeter anterior to posterior length. While this scan was motion-compromised, the scan suggested some minimal-to-mild undersurface fraying at the myotendinous junction of the supraspinatus component to the rotator cuff tendon. (Tr. 420).

Plaintiff saw Dr. Wade on several occasions in 2014 and reported back pain. Most of the notes are handwritten and the findings are not easily discernible. (Tr. 527-35).

Plaintiff presented to Dr. Mirly on May 28, 2015, for an evaluation of bilateral hand pain and tingling. Her symptoms were worse in her left. On examination, carpal tunnel provocative testing was positive on the right and negative on the left. Tinel and carpal compression were "quite productive" on the right and well tolerated on the left, with no exacerbation of symptoms. Plaintiff complained of more proximal parascapular and axillary pain in the left arm. An X-ray of the left wrist showed early posttraumatic arthritis, occurring at the ulnar aspect of the distal radius. Plaintiff healed with some degree of loss of radial inclination. There was no ulnar styloid nonunion. Dr. Mirly noted Plaintiff was "quite tender there" and advised her that if her symptoms persisted, they would consider and injection. He instructed Plaintiff to return on an as-needed basis. (Tr. 470).

On October 12, 2015, Plaintiff visited Dr. Nicholas Poulos at Neuroscience Center Belleville. Plaintiff told Dr. Poulos that she had neck pain radiating down into her bilateral shoulders and down through her left arm, and that she had low back pain that occasionally shot down into her legs. Plaintiff described the pain as a constant ache that was sharp at times. She rated that pain at a seven or eight in severity, and stated it was sometimes at a nine or ten. Plaintiff reported that turning her head in any direction increased her level of pain. Dr. Poulos diagnosed Plaintiff with foraminal stenosis of the cervical region. Dr. Poulos recommended a C3-4 cervical epidural injection for diagnostic and therapeutic purposes. (Tr. 448-50).

Plaintiff presented to Dr. Jennifer Schmitt at Neuroscience Center Belleville on November 23, 2015. She had not yet received the injection Dr. Poulos recommended, because her insurance did not cover it. Dr. Schmitt provided Plaintiff with trials of Mobic and Robaxin for symptomatic pain relief. (Tr. 451-52).

Plaintiff followed up with Dr. Schmitt on December 14, 2015 and reported that the Mobic and Robaxin had not eased her symptoms. Dr. Schmitt ordered a cervical CT myelogram for better quality images of Plaintiff's cervical spine. (Tr. 453-55).

Plaintiff followed up with Dr. Wade on January 28, 2016 for chronic back pain. (Tr. 536).

Plaintiff saw Dr. Craig Vinch on March 21, 2016 for chest and bilateral hand pain. She also reported a history of chronic neck pain. On physical examination, Dr. Vinch noted no neck pain and intact range of motion. She demonstrated no musculoskeletal or back pain. (Tr. 497-98).

Plaintiff followed up with Dr. Wade on July 1, 2016 for a medication refill and back pain. Dr. Wade continued her Tylenol with Codeine. (Tr. 552-53).

Plaintiff saw Dr. Wade on August 31, 2016 after falling and hurting her back. She reported increased pain in her left shoulder and thoracic spine. The pain worsened over the previous couple of weeks. Dr. Wade assessed Plaintiff with low back pain and refilled her Tylenol with Codeine. (Tr. 557-58).

Plaintiff underwent a yearly physical with Dr. Wade on December 20, 2016. Examination of her spine was normal and she demonstrated full range of motion. Her neck was supple, she had full range of motion, there was no cervical lymphadenopathy, and her thyroid was normal. (Tr. 561-64).

Plaintiff returned to Dr. Wade on January 23, 2017 and reported increasing left shoulder and neck pain with numbness down the arm and hand. Dr. Wade assessed her with low back pain, left shoulder pain, and left arm paresthesia. He ordered images of her cervical spine and left shoulder. (Tr. 565-67).

Plaintiff returned to Dr. Wade on February 6, 2017 and reported neck and left arm pain. She also had numbness in her left hand. She was unable to carry a gallon of milk without increased pain. On exam, she demonstrated pain with palpation over the left trapezius. She had decreased range of motion of the neck with left and right bending. Dr. Wade assessed Plaintiff with spondylosis of the cervical spine, left arm weakness, and left arm paresthesia. He refilled her Tylenol with Codeine and ordered an MRI of her neck. (Tr. 570-73).

### 3. State Agency Consultant RFC Assessments

State agency consultant Dr. Lenore Gonzalez conducted an RFC assessment of Plaintiff on October 16, 2014. She opined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday.

Plaintiff could occasionally climb ramps and stairs, kneel, crouch, and crawl. She could frequently balance. Plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 66-68).

State agency consultant Dr. Bernard Stevens conducted an RFC assessment of Plaintiff on March 30, 2015. He concurred with Dr. Gonzalez's assessment, except he found Plaintiff could frequently (not occasionally) climb ramps and stairs, stoop, kneel, and crouch. He also limited Plaintiff's overhead reaching on the right. (Tr. 78-80).

## Analysis

Plaintiff argues the ALJ's decision was erroneous because he did not categorize Plaintiff's foraminal stenosis of the cervical spine as a severe impairment at Step 2 of the 5-step sequential analysis. "The Step 2 determination is a *de minimis* screening for groundless claims. . . ." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal quotations and citations omitted). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. . . ." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010) (internal quotations and citations omitted). Therefore, if the ALJ finds at least one severe impairment, continues with the analysis, and considers the combined effects of all impairments, any error at Step 2 is harmless. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).

The ALJ, here, determined Plaintiff's degenerative disc disease of the lumbar spine and foraminal stenosis of the cervical spine were not severe impairments. However, the ALJ found Plaintiff had other severe impairments and continued with his analysis. He ultimately concluded Plaintiff was capable of frequently using her upper extremities for reaching, handling, and fingering.

In reaching this determination, the ALJ acknowledged Plaintiff's complaints, including difficulty styling her hair, reaching forward, reaching overhead, and pain, numbness, and tingling in her bilateral hands. However, the ALJ noted that radiographs of Plaintiff's shoulders showed only "mild" degenerative changes and spurring. The ALJ emphasized that Plaintiff underwent bilateral shoulder injections in October 2014 and "subsequent treatment notes show few complaints of ongoing shoulder pain attributable to degenerative joint disease, which suggests that the treatment effectively relieved her pain. Furthermore, there was no radiographic evidence of worsening degenerative changes, additional injections after October 2014, or recommendations for surgical intervention." (Tr. 24). The ALJ also stated, "[R]ecent treatment records contained subjective reports of back pain only in the context of a recent fall, and subsequent treatment notes failed to establish ongoing complaints of back pain." (Tr. 21). As to Plaintiff's carpal tunnel, the ALJ recognized Plaintiff underwent a left carpal tunnel release in January 2013 and that radiographs of her left wrist in May 2015 showed early post-traumatic arthritis. Nonetheless, the ALJ highlighted that Plaintiff's complaints were not consistently documented throughout the record and there was no evidence of a physician recommending additional surgery. (Tr. 24).

Plaintiff contends this analysis was erroneous because the ALJ failed to mention several portions of the record corroborating Plaintiff's allegations of back pain, shoulder pain, and carpal tunnel syndrome. An ALJ has a duty to evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Although an ALJ need not mention every piece of evidence in the record, he must articulate a "logical bridge" between the evidence and his conclusions and cannot ignore an entire line of evidence contrary to his ruling. *Terry v. Astrue*, 580 F.3d 471, 475-77 (7th Cir. 2009). On review, the Court does not "nitpick the ALJ's opinion," but rather, "give[s] it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

In regard to Plaintiff's back issues, the ALJ allegedly did not cite: Dr. Poulos's treatment note from October 12, 2015, which included a diagnosis of foraminal stenosis of the cervical region based on an MRI from January 2015; an emergency room report from July 2014 indicating Plaintiff complained of a long history of shoulder pain and documenting a physical examination revealing limited range of motion and tenderness in the upper back; an MRI of Plaintiff's left shoulder from October 2014 showing borderline type III lateral tilted acromion process, mild rotator cuff peritendinitis, and minimal-to-mild undersurface fraying at the myotendinous junction of the supraspinatus component to the rotator cuff tendon; Dr. Schmitt's record from November 2015, which included a diagnosis of multilevel foraminal stenosis, a recommendation for steroid injections, and a prescription for Robaxin and meloxicam; Dr. Schmitt's record from December 2015, when Plaintiff reported no pain relief with Robaxin and meloxicam and images demonstrated multilevel foraminal stenosis; a medical record from August 2016, in which Plaintiff reported tripping and falling and experiencing increased pain in the left shoulder and thoracic spine; a record from January 2017 that documented Plaintiff's

complaints of increased left shoulder and neck pain and noted tenderness to the left trapezius with spasticity and decreased range of motion of the left shoulder; and a note from February 2017, where Plaintiff reported left neck pain with exacerbations through the shoulder, Plaintiff demonstrated pain with palpation of the left trapezius, and a physician assistant diagnosed Plaintiff with spondylosis of the cervical spine.

Plaintiff accurately points out medical evidence the ALJ did not cite. But that evidence is not contrary to the ALJ's decision. For instance, the ALJ failed to mention specific instances where radiographs demonstrated, and physicians confirmed, diagnoses of foraminal stenosis and degenerative disc disease of the lumbar spine. However, the ALJ never contested those diagnoses, and in fact, he specifically recognized them: "[T]he medical evidence shows the claimant carries diagnoses of . . . foraminal stenosis of the cervical spine, and early degenerative disc disease of the lumbar spine." (Tr. 20). Plaintiff also cites portions of the record where she complains of shoulder and back pain. However, the ALJ recognized Plaintiff's complaints on multiple occasions in his decision. He summarized Plaintiff's difficulty with reaching, stated that she "alleged back pain as one of her primary problems," and noted that she "had sharp, dull pain in her shoulders that radiated to her neck. . ." (Tr. 21, 23, 24). Additionally, some of the missing records indicate Plaintiff's physicians recommended steroid injections. However, the ALJ mentioned that Plaintiff received injections. (Tr. 24). Plaintiff also argues the ALJ did not mention a medical record from August 2016, in which Plaintiff reported

tripping and falling and experiencing increased pain in the left shoulder and thoracic spine. The ALJ did consider this record, though. He stated, "[R]ecent treatment records contained subjective reports of back pain only in the context of a recent fall . . ." (Tr. 21). Finally, Plaintiff takes issue with the ALJ's failure to mention records where she reported no pain relief with Robaxin and meloxicam and demonstrated tenderness of the left trapezius and decreased range of motion of the left shoulder on physical examination. Although the ALJ did not expressly account for this evidence, he acknowledged there was "objective diagnostic evidence of degenerative joint disease" that supported "a more restrictive residual functional capacity" than the ones set forth in the state-agency consultants' assessments.

Plaintiff also contends the ALJ erroneously left out evidence related to her carpal tunnel. Specifically, the ALJ allegedly did not mention: Dr. Mirly's record from September 2014 where Plaintiff reported symptoms consistent with bilateral carpal tunnel and Dr. Mirly confirmed he performed carpal tunnel release surgery with good results until the previous six months; Dr. Mirly's record from October 2014 in which he stated a nerve conduction study revealed mild residual left carpal tunnel; and a record from Dr. Mirly dated January 2013, where an examination revealed positive carpal tunnel provocative testing on the right but negative on the left, and productive Tinel and carpal compression on the right. In that same record, Dr. Mirly confirmed that an X-ray of Plaintiff's left wrist revealed early post-traumatic arthritis and he noted Plaintiff had healed with some degree of loss of radial inclination, had an ulnar styloid nonunion, and was tender. Dr. Mirly offered

an injection if the pain persisted. Finally, the ALJ apparently failed to mention a medical record from October 2015 where Plaintiff reported numbness and tingling in her left hand and fingers and the treatment provider noted she had mild carpal tunnel syndrome in the right hand.

Even though the ALJ did not specifically mention all this evidence, he did not ignore an entire line of evidence contrary to his conclusions. The ALJ listed carpal tunnel as a severe impairment at Step 2. He then acknowledged Plaintiff's reports of numbness in her hands. He also noted her allegations that she had difficulty using her hands and her wrists sometimes gave out. (Tr. 20, 23). Additionally, the ALJ mentioned the X-ray of Plaintiff's left wrist demonstrating early post-traumatic arthritis. (Tr. 24). Plaintiff has ultimately failed to explain how the above-cited evidence would change the ALJ's decision.

All-in-all, the ALJ built a logical bridge between his conclusions and the evidence. Although he omitted certain portions of the record in his discussion, the ALJ did not commit reversible error. The ALJ's decision demonstrates he considered all the *relevant* evidence; it is not the ALJ's duty to mention *all* the evidence in the record.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATE:** December 6, 2018.

s/ Clifford J. Proud
CLIFFORD J. PROUD
UNITED STATES MAGISTRATE JUDGE